**EASTERN TRANSP. CO. v. UNITED STATES.**

**UNITED STATES v. EASTERN TRANSP. CO.**

Nos. 219, 220, Dockets 20928, 20929.

Circuit Court of Appeals, Second Circuit.

April 28, 1948.

Arthur M. Boal, of New York City, J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., and Tompkins, Boal & Tompkins, of New York City (Terriberry, Young, Rault & Carroll, and Jos. M. Rault, all of New Orleans, La., of counsel), for appellant.

Christopher E. Heckman and Foley & Martin, both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree in the admiralty in two suits for damages—consolidated for trial—arising out of a collision in Hell Gate between the ship, "Del Rio," and two barges in tow of the tug, "Goliah," and between a helper tug of the "Del Rio," the "Moran," and the "Goliah," herself. The United States, owner of the "Del Rio," sued the Eastern Transportation Company, owner of the "Goliah" and her barges; the Eastern Transportation Company in turn sued the United States. The judge held the "Del Rio" solely at fault, dismissed the libel of the United States and passed an interlocutory decree in favor of the Eastern Transportation Company. The only issue is as to which vessel—the ship or the tug—was at fault in her navigation. About midday on July 9, 1944, the "Del Rio," attended by the tug, "Moran," on her port bow, was bound east up the East River upon the flood tide; east of Hell Gate Bridge, was the "Goliah" bound west with two barges side by side, each on separate hawsers about 120 feet long. At some point in the neighborhood of Hell Gate Bridge and close to the Ward's Island shore, the "Del Rio," on a swing to port, cut in between the two barges, colliding with and damaging both them and herself; and at the same time the tugs "Moran" and "Goliah" collided, and both of them were also injured. The facts are not in serious dispute except as to the place of the collision between the "Del Rio" and the barges, which the judge upon a conflict of testimony found to be substantially under the Hell Gate Bridge. The "Del Rio" argues that it must have happened 750 feet or thereabouts west of the bridge, because, if it had been under the bridge, one of the barges could not have anchored under the bridge as she did, but would have been carried to the eastward by the flood which was making at about three knots. It is undoubtedly true that the barge could not have been struck just where she anchored, but the distance she drifted on the tide depends upon how long it took the bargee to run forward and let go his anchor; and the "Del Rio's" assumption that this took three minutes is gratuitous and prima facie unlikely. All that can be said is that the collision was at some unascertainable distance west of, but not very far from, the bridge. The judge accepted the testimony of those witnesses who placed it not far from the bridge, particularly that of Jacobson, master of the tug "Brimstone," who said that the barges were "nearly directly underneath or perhaps a little west of the Hell Gate Bridge." We accept this as not shown to have been "clearly erroneous."

The collision took place during the war, and lights had been installed on the Triboro and the Hell Gate bridges to speed traffic through this troublesome stretch of water. When the light on either bridge was green, it was a signal to an approaching vessel that no vessels were observable coming the other way; and the directions read that vessels "may proceed and maintain speed." When it turned red it indicated that there was a vessel coming the other way, and the regulation read: "Proceed with caution." In general the direction was: "These lights are warning lights only and should not be construed as navigation orders." As the "Del Rio" had been coming up between Blackwell's Island and the Manhattan shore, she saw a flotilla ahead of her made up of the tug, "Brimstone," with four barges on a hawser, two abreast, the length of which from end to end was about 500 feet. The "Del Rio" was overtaking it, and when the "Brimstone" had passed Hallett's Point, she blew her an overtaking signal which the "Brimstone" answered with a danger signal, for she had heard the bend signal of the "Goliah," as apparently the "Del Rio" had not. Nevertheless, the pilot on the "Del Rio," seeing the green light on the Triboro Bridge, assumed that, while it lasted, it was a positive direction to press on; his testimony as to this was unequivocal: "we had orders to keep going so that we could get through"; again, "we wanted to get through and that was our orders, to keep going, especially with those ships making only eight or ten knots." However, after he had passed Hallett's Point—just

how soon thereafter does not appear—the light changed to red, and he found himself in a serious predicament. The "Brimstone" and her tow, as was inevitable at that place and on that tide, had swung athwart the thread of the channel in front of him. The flood makes straight upon Ward's Island from Blackwell's Island and divides: one part turns sharply to the east around Negro Point, and flows over towards the Scaly Rocks on the Astoria shore, on which it will put a vessel ashore unless she takes adequate action to prevent it. Consequently, the practice has long been established, and is indeed necessary, for an east-bound vessel to give Negro Point a narrow berth, as she rounds it under a left rudder; and, although that of course puts her far to the left of the thread of this narrow channel, we have again and again recognized this navigation as proper. Moreover, when an east-bound tug with a tow, 500 feet long, turns Negro Point, it is impossible for her to keep the tow straight behind her. After she has herself swung around the point, her tow will continue to feel the effect of the tide, and will be swung over to starboard and askew of the channel.

■ All this was to be expected by a pilot familiar with the waters; and it is just what happened. The "Del Rio's" pilot undoubtedly spoke the truth, when he said that under the Triboro Bridge the "Brimstone" flotilla "was taking practically up all the river. He was going on practically a 45-degree angle." Perhaps the "Brimstone's" master did not handle his tow as deftly as he should; it may not have been necessary for him to let it take "practically up all the river"; but it was certain that it would swing somewhat, and the most elementary caution required the pilot not to take chances as to how great the swing would be. When he learned that a west-bound vessel was approaching, the pilot's position became perilous. On the one hand, it would be reckless to try to pass between the stern of the "Brimstone's" barges and the Scaly Rocks, and, on the other no one could forsee how much water there would be between the bows of the "Brimstone" herself and the oncoming vessel. The pilot should never have allowed himself to be put in such a position; and probably he would not have done so, had he not totally misapprehended the meaning of the green light. Unlike a street traffic light, it did not give a fixed interval during which all vessels should keep on and after which they must hold back; he should have been prepared for it to change at any moment. There was not the least necessity for him not to allow the "Brimstone's" flotilla a long enough lead to get through the Gate ahead of him, if the light should change. True, he had the tide under foot; but he was going too fast anyway, and he had the "Moran" to hold him back. Nothing but haste required him to put himself in a position where he must cross the "Brimstone's" bows, or go under the barges' sterns, each a highly dangerous undertaking. Had there been no lights, his navigation would have been obviously reckless and unpardonable; and the lights did not relieve him, for the reasons we have given.

■ Whether the "Goliah" was also at fault depends upon whether, having herself got a red light while she was east of the Hell Gate Bridge, she should have held back: that is, whether to keep on under the bridge embarrassed the navigation of the "Del Rio." That she kept as close to the Ward's Island shore as she safely could we do not understand to be denied; at any rate there is no evidence that she could safely have come in closer, and the judge found that she could not have done so. We cannot see why it would have aided the navigation of the "Del Rio" for her to keep east of the bridge; on the contrary, it was better to get her tow as far to the west of it as she could, at least if she herself did not get west of the "W. I. Dock" about half way between the bridges. The difficulty for the "Del Rio" was the presence of the "Brimstone" flotilla, catercornered in this narrow channel. Not only was the "Brimstone" herself east of the bridge, but Jacobson, her master, swore that the tail of the tow had also passed the bridge; and if so, the tug was about 500 feet beyond it. With the flotilla in that position the safest course was for the "Goliah" to get as far as she could to the west before

the "Del Rio" had to pass between the "Brimstone" tug and any part of the "Goliah" flotilla, provided of course that flotilla hugged the Ward's Island shore. This follows from the fact that, as indeed the event proved, the "Goliah" flotilla was in effect a single vessel 500 feet long, like the "Brimstone" flotilla. The "Del Rio" had to cross between the "Brimstone," which was further to the left than her barges, and the "Goliah" flotilla which was straight in the channel, and the "Brimstone" kept moving, so that, as we have seen, at the time of the collision she was nearly 500 feet east of the bridge. If so, when the red light on that bridge appeared, if the "Goliah" was only 150 feet east of the bridge as her master swore she was, she was already opposite the "Brimstone" tug and nothing would have been gained by stopping. Her best chance was to try to get her barges past the "Brimstone" before the "Del Rio" had to cross that tug's bows. The case was one of special circumstances, and at worst the "Del Rio" did not prove her at fault.

Nor was there any custom for westbound tows on learning that an east-bound vessel was approaching, to hold back at the Hell Gate Bridge. Certainly we can find no satisfactory evidence of one; nor can we see any reason for one, even if the "Brimstone" had not been where she was. A vessel coming east around Negro Point must indeed hug the Ward's Island shore, as we have said; but her chief concern is to have as wide a berth as possible on her starboard hand, for her difficulty will be to hold herself against the easterly sweep of the tide. She has nothing to fear from a vessel which may be coming west, which keeps close to the Ward's Island shore; and it makes not the faintest difference how far such a vessel may have passed on to the west, provided she does not get too near Negro Point; as for example, no nearer than the "W. I. Dock," as we have suggested. Indeed, the "Goliah" asserts that there is a custom which permits the west-bound vessel to go that far, though we are not prepared to agree that such a custom was proved.

Decree affirmed.

Gilbert S. Fleischer, of New York City, and J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y., for appellant.

Charles W. Hagen, of New York City, for Erie R. Co.